IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-02167-PAB-KLM

2-BT, LLC, d/b/a Premier Heating and Air,

      Plaintiff,

v.

PREFERRED CONTRACTORS INSURANCE COMPANY RISK RETENTION GROUP,
LLC, d/b/a National Service Contractors Association/Preferred Contractors Association
and ServiceContractors.org,

      Defendant.

---

**ORDER**

---

    This matter is before the Court on the Motion for Summary Judgment of
Preferred Contractors Insurance Company Risk Retention Group, LLC ("PCIC") [Docket
No. 32] and the Motion to Strike Defendant's Summary Judgment Reply Evidence of 2-
BT, LLC ("2-BT") [Docket No. 43].  The Court has subject matter jurisdiction pursuant to
28 U.S.C. § 1332(a).

**I.  BACKGROUND**[1]

    This case arises out of an insurance coverage dispute between 2-BT and PCIC.
2-BT is a heating, ventilation, and air conditioning ("HVAC") contractor that services and
installs furnaces, air conditioning, and air quality systems.  Docket No. 32 at 4, ¶ 13.  In
order to carry out its work, 2-BT uses a variety of tools including pressure gauges,
combustion analyzers, gas detectors, micron gauges, soldering devices, and various

---

[1]The following facts are undisputed unless otherwise indicated.

heat sources.  *Id.* at 5, ¶¶ 20-21.  Seventy-five percent of 2-BT's work involves the use of a heat source while the other 25% does not.  Docket No. 42 at 2, ¶ 19.  Other services 2-BT provides, such as installing furnaces, ducts, and carbon monoxide detection equipment, do not require the use of a heat source.  Docket No. 32 at 5, ¶ 20. 2-BT faces the risk of liability from its use of heat sources, as well as from activities resulting in improper installation, improper ventilation, damage from condensation, or other negligent acts.  *Id.* at 5-6, ¶¶ 23-24.

In 2009, 2-BT was a member of Service Magic, a marketing company that pairs homeowners and home improvement contractors.  *Id.* at 6, ¶¶ 25-28.  Service Magic requires its members to carry liability insurance and, as a result, Service Magic referred 2-BT to Edemnify Insurance Brokers ("Edemnify").  *Id.*; Docket No. 62-1 at 29:21-24.

2-BT alleges that Jess Driggers, a principal and 50% owner of 2-BT, reviewed online information about PCIC's insurance policies.  Docket No. 32 at 8; Docket No. 35 at 9, ¶¶ 37-40.  In particular, Mr. Driggers claims to have seen the statement "PCIC's personalized underwriting process allows us to tailor coverage to properly outfit the contractor with excellent coverage and rates" on the website www.sisinsurer.com.  *Id.* Docket No. 32-1 at 20, 90:13-91:1; *see* Docket No. 32-11 at 7.  Mr. Driggers asserts that he saw this statement before 2-BT acquired the policy and that he relied on this statement in deciding to purchase coverage.  Docket No. 32-1 at 20, 90:16-91:8; Docket No. 35-1 at 1.

Mr. Driggers filled out and signed an insurance application on behalf of 2-BT which included initialing seven paragraphs on page four of the application.  Docket No.

32 at 8, ¶¶ 42-43; Docket No. 32-12 at 5.  One of the paragraphs Mr. Driggers initialed

was labeled "Policy Exclusions" and stated that liability from "fungi/bacteria," "work not

disclosed in this application," "open flame," and "use of heating devices" was excluded

from coverage.  Docket No. 32-12 at 5.  The parties do not dispute that Mr. Driggers'

initials constitute 2-BT's acknowledgment and acceptance of the policy exclusions.

Docket No. 32 at 8, ¶ 44; Docket No. 35 at 8.  2-BT submitted the application to PCIC.

 After processing 2-BT's application, PCIC issued commercial general liability

insurance policy number PCIC5030-PCA51252 to 2-BT.  This policy was in effect from

June 18, 2010 to June 18, 2011.  *Id.*  The policy promised to:

> pay those sums that the insured becomes legally obligated to pay as
> damages because of 'bodily injury' or 'property damage' to which this
> insurance applies . . . [h]owever, we will have no duty to defend the insured
> against any 'suit' seeking damages for 'bodily injury' or 'property damage' to
> which this insurance does not apply.

Docket No. 32-3 at 14.  The portion entitled "Additional Exclusions" listed 27 paragraphs

of exclusions, with exclusions for mold and heating elements set forth in paragraphs (G)

and (K) respectively.  *Id.* at 46-53.  The policy provided coverage for other risks

including, but not limited to, bodily injury, advertising injury, and property damage

caused from non-excluded occurrences.  Docket No. 32 at 11, ¶ 61.

 On or about July 27, 2010, 2-BT was performing an air conditioning

repair/replacement job in the furnace room of a condominium owned by Aaron Everitt

and Isvara Jones Everitt ("the Everitts"), located in Aurora, Colorado.  *Id.* at 2, ¶¶ 1-2.

While braising an indoor coil with a blow torch, a 2-BT employee triggered a fire

sprinkler which flooded the condominium and neighboring unit.  *Id.* at 2-3, ¶¶ 2, 7.

 The Everitts filed an action against 2-BT in the District Court for Arapahoe

3

County, Colorado, case number 11CV1544, asserting claims for breach of contract and negligence. *Id.* at 3, ¶¶ 6-7. The Everitts sought damages associated with the flooding in both condominium units. *Id.* They further sought damages for mold that grew as a result of the flooding. *Id.* State Farm, the Everitts' property insurer, filed a complaint in subrogation in Arapahoe District Court, case number 12CV743, seeking recovery for amounts paid to the Everitts for property damage. *Id.* at 3, ¶ 8.

In the action brought by the Everitts, the trial court found that the 2-BT employee's use of the blow torch activated the fire suppression system, thereby causing flooding in both units. *Id.* at 4, ¶¶ 10-12. Additionally, the trial court determined it was more probable than not that the mold found in the Everitt unit was a result of flooding caused by the activation of the sprinkler system. *Id.*

2-BT submitted a claim to PCIC stating that its employee was "braising in an indoor coil" resulting in the sprinkler system causing "water damage." Docket No. 32-9. PCIC denied coverage [Docket No. 32 at 10-11, ¶¶ 58-60], and this action followed. 2-BT brings claims against PCIC for fraud, deceptive trade practices under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 (2013) *et seq.*, and breach of contract. Docket No. 4 at 3-6.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment*. Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and

any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Fraud

The elements of fraud in Colorado are:[2]

> [1]that the defendant made a false representation of a material fact, [2] knowing that representation to be false; [3] that the person to whom the representation was made was ignorant of the falsity; [4] that the representation was made with the intention that it be acted upon; and, [5] that the reliance resulted in damage to the plaintiff.

*Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).

2-BT bases its fraud claim on the phrase "PCIC's personalized underwriting process allows us to tailor coverage to properly outfit the contractor with excellent coverage and rates."  Docket No. 32-11 at 7.  2-BT alleges that this language was part of PCIC's online advertising.  Docket No. 35 at 2.[3]  PCIC disputes whether or not Mr.

---

[2]Generally, a federal court sitting in diversity applies the substantive law of the forum state. *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 683 (10th Cir. 2007).  Both parties assume that Colorado law applies to the instant case, and the Court finds no reason to apply the law of another state.

[3]The parties dispute who made the statement.  2-BT admits that the "only marketing materials 2-BT reviewed prior to filling out an application and obtaining coverage were online at the Edemnify website."  Docket No. 32 at 7, ¶ 35; Docket No. 35 at 8.  However, 2-BT argues in its response brief that any representations made by Edemnify are attributable to PCIC.  *Id.* at 8-9, ¶¶ 29-32.  In support of its argument that Edemnify is an agent of PCIC, 2-BT cites paragraphs 2, 5, 6, and 7 of the Complaint. Docket No. 4 at 1-2, ¶¶ 2, 5-7.  Contrary to 2-BT's argument, the Complaint does not allege that Edemnify was an agent of PCIC and, in fact, does not mention Edemnify at all.  The Final Pretrial Order is also silent on any connection between Edemnify and PCIC.  Docket No. 54 at 2-3.  PCIC claims that the above-mentioned statement was printed from an unaffiliated website, servicecontractors.org [Docket No. 42 at 3], and

Driggers actually viewed the statement prior to acquiring coverage.  Docket 32 at 7,

¶ 38.  As a threshold matter, viewing the facts and inferences in the light most favorable

to 2-BT, the Court concludes 2-BT has presented sufficient evidence such that a

reasonable juror could find that Mr. Driggers viewed and relied on the statement prior to

acquiring coverage.  Docket No. 32-1 at 20, 90:16-91:5; Docket 35-1 at 1.

PCIC argues that the representation that it provides "excellent coverage" is a

statement of opinion that is not actionable.  Docket No. 32 at 18, 22.[4]  Puffery, or a

statement of opinion that no reasonable person would rely on as an assertion of fact,

does not constitute an actionable statement of misrepresentation.  *Alpine Bank v.*

*Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009) (applying Colorado law); *see Black's*

*Law Dictionary* 1269 (8th ed. 2004) (defining puffing as "[t]he expression of an

exaggerated opinion—as opposed to a factual misrepresentation—with the intent to sell

a good or service.").  The key issue in determining if a statement is puffery is whether a

reasonable person would interpret the representation as a general statement of opinion

or a specific statement of fact.  *Park Rise Homeowners Ass'n v. Res. Constr. Co.*, 155

---

PCIC has attached two affidavits to its reply brief asserting that PCIC has no legal
affiliation with Edemnify or servicecontractors.org [Docket No. 42-1, Docket No. 42-2].
2-BT filed a Motion to Strike, claiming that the affidavits were untimely and asserted
improper legal conclusions.  Docket No. 43 at 2.  However, because 2-BT has failed to
provide sufficient evidentiary support for its assertion of an agency relationship between
PCIC, Edemnify, and servicecontractors.org, the Court need not consider the affidavits
in resolving this motion.  As noted below, 2-BT's fraud, CCPA, and breach of contract
claims fail regardless of who made the statement at issue.

[4]Plaintiff fails to respond to this argument, which, by itself, provides the Court
with sufficient grounds to grant defendant's motion as to plaintiff's fraud and Colorado
Consumer Protection Act claims.  However, even when considered on the merits rather
than through default, the Court determines that defendant's puffery argument is valid.

P.3d 427, 436 (Colo. App. 2006); *see Hubbell*, 555 F.3d at 1106; *Giles v. Inflatable Store, Inc.*, No. 07-cv-00401-PAB-KLM, 2009 WL 961469, at *3 (D. Colo. April 6, 2009). Context is highly relevant, including the expertise of the speaker and listener, the size of the audience, and the medium of expression. *Hubbell*, 555 F.3d at 1106-07. "Mass advertising expressed in vague terms (as in political campaigns) is not relied on by rational adults." *Id.* at 1107.

In *Park Rise Homeowners Ass'n*, the Colorado Court of Appeals applied this framework to a statement in a builder's advertising materials claiming its work was "quality construction." 155 P.3d at 435. The court held the statement to be one of opinion, "the meaning of which would depend on the speaker's frame of reference." *Id.* at 436 ("It is not a specific representation of fact subject to measure or calibration."); *see also Knight v. Cantrell*, 390 P.2d 948, 951 (Colo. 1964) ("The statement that 'it is a good house' is not, under the circumstances here outlined, a statement of fact–at most it is opinion not susceptible of proof either as, or as not, a fact."); *Hubbell*, 555 F.3d at 1107 (bank advertising urging home buyers to "concentrate on your dream . . . [w]e'll take care of everything else" was not actionable); *Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991) ("You're in good hands with Allstate" was "not a statement of fact, and therefore cannot rise to the level of common law fraud").

In this case, the statement "tailors coverage to properly outfit the contractor with excellent coverage" is mere puffery. First, "excellent coverage" is not a specific representation of fact subject to measurement. Second, the representation to "properly outfit the contractor" is a general statement of opinion. An actionable statement must

be one of fact, capable of being objectively proven both true *and* false.  *See Knight*, 390

P.2d at 951.  The statement, as a whole, "PCIC's personalized underwriting process

allows us to tailor coverage to properly outfit the contractor with excellent coverage and

rates," is not one of fact, but rather a vague statement of opinion that no reasonable

person would consider an objective statement of warranty.

Because the statement at issue is not actionable as a matter of law, no genuine

issue of material fact exists.  Therefore, the Court will grant PCIC's Motion for Summary

Judgment with respect to 2-BT's fraud claim.

### B.  Colorado Consumer Protection Act

2-BT alleges that the statement "tailors coverage to properly outfit the contractor

with excellent coverage" is a deceptive trade practice in violation of the CCPA.

Under the CCPA, a plaintiff bringing a private claim for relief must show:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006).  The Court finds that the 2-BT has failed

to establish sufficient facts to support at least two of the elements.

### 1.  Deceptive Trade Practice

Under the CCPA, a false representation inducing a party to act or to refrain from

acting, or a false representation that has the capacity or tendency to attract consumers

is considered a deceptive trade practice.  *Rhino Linings USA, Inc. v. Rocky Mountain*

*Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003).  Actionable representations are

defined by statute, Colo. Rev. Stat. § 6-1-105 (2013), and interpreted by the courts. Colorado courts hold that "the CCPA does not, as a matter of law, make actionable a statement which would otherwise be mere puffery." *Park Rise*, 155 P.3d at 435; *accord Hubbell*, 555 F.3d at 1112.

For the reasons stated above, the statement "tailors coverage to properly outfit the contractor with excellent coverage" is mere puffery and, accordingly, is not actionable under the CCPA as a matter of law. *See Park Rise*, 155 P.3d at 435.

### 2. *Public Impact*

Assuming *arguendo* that the above-mentioned statement constitutes a deceptive trade practice, 2-BT has failed to produce any evidence on which a reasonable trier of fact could find that the trade practice "significantly impact[s] the public as actual or potential consumers of the defendant's goods, services, or property." *See Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998). Courts consider at least three factors when evaluating public impact:

> (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Crowe*, 126 P.3d at 208.

In support of its claim, 2-BT cites an 18 page list of policies that PCIC has provided to HVAC contractors since 2010, Docket No. 35-2, and states that the list is sufficient to show the public was "exposed to this deception." Docket No. 35 at 11. However, in order to support a finding of public impact, 2-BT must show how many

policy holders have been and are likely to be affected by the statement at issue, not simply how many policies PCIC has issued.  Even if the Court infers that some of the policy holders viewed the statement, 2-BT points to nothing in the record suggesting that any other HVAC contractor relied on the statement in the same way as Mr. Driggers and were, or are likely to be, similarly affected.

Because the statement at issue is not actionable as a matter of law and no reasonable juror could find the statement had a sufficient public impact, the Court will grant PCIC's Motion for Summary Judgment on 2-BT's CCPA claim.

### C.  Breach of Contract

2-BT asks the Court to reform the policy to require coverage under the reasonable expectations doctrine and because 2-BT claims the policy is illusory.

#### 1.  Reasonable Expectations

2-BT claims that the policy does not meet the reasonable expectations of an HVAC contractor, is therefore ambiguous from the perspective of an HVAC contractor, and should be construed to cover property damage arising out of the use of a heat element.  Docket No. 35 at 11-12.

Colorado courts recognize that insurance contracts create "significant potential for insurers to take advantage of or mislead insureds."  *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048 (Colo. 2011).  Public policy favors protecting consumers by requiring insurers to fully and fairly disclose the degree of insurance protection a policy actually provides.  *Id.* at 1049.  As a result, all insurance policies in Colorado are carefully scrutinized and subject to the doctrine of reasonable expectations which

"obligates insurers to clearly and adequately convey coverage-limiting provisions to insureds." *Id.* at 1048.  The doctrine does not replace traditional principles of contract interpretation, but instead requires courts to interpret insurance policy terms and interactions with insurers based on an objective, reasonable insured standard.  *Id.* at 1050-51.  PCIC argues that the doctrine is only applicable if the contract is found ambiguous as a matter of law.  Docket No. 32 at 27.  However, the Colorado Supreme Court has held that the doctrine applies when "policy coverage-provisions may not be ambiguous in a technical sense, . . . but are ambiguous from the perspective of an ordinary reader." *Bailey*, 255 P.3d at 1050.

Under Colorado law, the court may reform an insurance policy based on the doctrine of reasonable expectations in two situations:

> (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue; and (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise.

*Bailey*, 255 P.3d at 1048-49.

### a.  Language of the Policy

Terms and conditions of an insurance policy must construed as they would be understood by the ordinary policyholder.  *Regional Bank of Colo., N.A. v. St. Paul Fire and Marine Ins. Co.*, 35 F.3d 494, 497 (10th Cir. 1994) (applying Colorado law); *Bailey*, 255 P.3d at 1051 ("the whole policy is construed as it would be understood by an ordinary insured").  "A trial court may not look beyond the plain words of an insurance contract to interpret it based on the contracting parties' underlying intent unless the

contract terms are ambiguous or are used in a special or technical sense not defined in the contract." *TerraMatrix, Inc. v. United States Fire Ins. Co.,* 939 P.2d 483, 486 (Colo. App. 1997).  The policy must be read as a whole, regardless of whether "painstaking study of the policy provisions would have negated [the insured's] expectations." *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 168 (Colo. 1993) (quoting Robert E. Keeton, *Insurance Law-Basic Text* § 6.3(a) at 351 (1971)).  Whether the insured *actually* read the policy is immaterial – the question is what an ordinary reader and purchaser would have understood the insurance provisions to mean *had* he or she read the entire policy.  *Bailey*, 255 P.3d at 1051.

In *Bailey*, the court declined to reform a rental car agreement after finding that an ordinary reader of the policy would reasonably conclude that coverage would not apply to use of the car for felonious conduct.  *Bailey*, 255 P.3d at 1052.  In *Nissen*, the insurer denied coverage to a policy holder injured while trying to recover her car from a thief because the thief did not have consent to drive the car and because the uninsured-motorist provision excluded a car insured under the policy.  851 P.2d at 166.  The court held that an ordinary reader would understand the policy provided coverage for such an event and reformed the policy accordingly.  *Id.* at 169-70.  *See also Regional Bank of Colorado*, 35 F.3d at 498 (interpreting a policy exclusion for pollutants and holding that a "reasonable policy holder would not understand the policy to exclude coverage for *anything* that irritates" (emphasis original)).

The Court now turns to the PCIC policy purchased by 2-BT.  Because both parties acknowledge that the application that 2-BT filled out was incorporated into the

policy itself, the Court will consider the application and the policy together.  Docket No. 32 at 8, ¶ 43; Docket No. 35 at 13-14.  The application's first three pages are introductory sections where the applicant must enter basic information including the type of work it performs.   Docket No. 32-12 at 2-4.  The final page requires the applicant to initial certain paragraphs.  *Id.* at 5.  The "Policy Exclusions" paragraph states that the exclusions are not limited to those listed in the application and include exclusions for "fungi/bacteria," "work not disclosed in this application," "open flame," and "heating devices."  *Id.*

As for the policy itself, the first two pages contain paragraphs warning that the policy contains exclusions.  Docket No. 32-3 at 3, 4.  Section I of the policy states that the insurer will pay damages for bodily injury and property damage "to which this insurance applies," but immediately thereafter states that it has no duty to pay for damages "to which this insurance does not apply."  *Id.* at 14.  The policy mentions general exclusions, none of which are at issue in this case, and the next six sections lay out the policy terms, none of which, based on an ordinary reading, tends to contradict any of the exclusions at issue.  *Id.* at 15-33.

Part VIII contains the relevant exclusions.  Paragraph (K) excludes:

Any claim for property damage arising out of, resulting from, cause by, contributed to, or in any way related to the use of fire or heating devices in connection with the project the insured is working on including heat wand, welding, open flame, torch, heaters, or other type of heat application.

*Id.* at 48.  Paragraph (G) is similarly stated and excludes from coverage any injury or damage related to fungi, bacteria or spores.  *Id.* at 47.

Considering the application and policy as a whole, both consistently state that

liabilities arising from the use of heating elements and the presence of fungi/bacteria are excluded from coverage such that an ordinary reader would not have a reasonable expectation to the contrary.  Furthermore, the exclusions themselves do not conflict with any of the other provisions in either document especially when the policy promises to cover only those occurrences that fall within it.

2-BT argues that the application and policy are ambiguous from the point of view of an HVAC contractor because an HVAC contractor would reasonably expect heat element work to be covered by a policy.  Docket No. 35 at 11-13.  Here, the relevant inquiry is not what an HVAC contractor might reasonably expect, but what an ordinary reader would reasonably expect and understand upon a reading of the entire policy. *See Bailey*, 255 P.3d at 1051.  A ordinary reader would understand that liabilities for the use of heat sources are excluded by the policy.

2-BT next claims that the application is ambiguous as a matter of law, arguing that the heating element exclusion could be read both as applying only to work "not disclosed" or as excluding all work concerning heating elements.  Docket No. 35 at 4. The full phrase reads "work not disclosed in this application such as structural work and plumbing will be excluded."  Docket No. 32-12 at 5.  The Court perceives no ambiguity. The fact that 2-BT disclosed that it was performing "Air conditioning and heating repair and replacement" [Docket No. 32-12 at 4] does not modify or have any logical connection to the plainly stated exclusion for heating devices.

Finally, 2-BT claims that the application is facially contradictory because it could be read to require, for example, a painter to initial an exclusion on the storage and disposal of paints.  However, even if the application itself could be viewed as

15

contradictory, it must be read in concert with the entire insurance policy.  As noted above, an ordinary reader of the application and insurance policy would not have a reasonable expectation of coverage for the use of a heating element.

2-BT argues that it should be allowed to prove that the heat element exclusion is actually an exclusion meant for roofers and was mistakenly placed in an HVAC policy. Docket No. 35 at 13.  The Court, however, cannot find any reference to this argument in the complaint [Docket No. 4], and 2-BT did not provide any evidentiary support for this argument in the record.  Thus, the Court rejects the argument as unsupported.

The Court finds that an ordinary reader of the entire application and policy would reasonably expect that liability arising from mold and the use of heating elements would be excluded from coverage.  PCIC's Motion for Summary Judgment will be granted on the issue of reasonable expectations created by the language of the policy.

### b.  Deception

Courts may reform an insurance contract based on the reasonable expectations doctrine when circumstances attributable to the insurer deceive "ordinary, objectively reasonable insureds into believing that they are entitled to coverage, while the insurer would maintain they do not enjoy such coverage." *Bailey*, 255 P.3d at 1053.  Thus, even though an insurance agreement is "not ambiguous in the sense that the instrument is subject to two possible interpretations," the reasonable expectations doctrine may apply where "the deceptive character of language . . . leads an average [insured] to believe that he or she has paid for broad protection against collision liability." *Davis v. M.L.G. Corp.*, 712 P.2d 985, 989 (Colo. 1986).

In order for reasonable expectations to prevail over exclusionary policy

> language, an "insured must demonstrate through extrinsic evidence that its expectation[s] of coverage [are] based on specific facts which make these expectations reasonable." These specific facts must show that, through procedural or substantive deception attributable to the insurer, an objectively reasonable insured would have believed he or she possessed coverage later denied by an insurer.

*Bailey*, 255 P.3d at 1054 (quoting *O'Neill Investigations, Inc. v. Ill. Emp. Ins. of Wausau*, 636 P.2d 1170, 1177 (Alaska 1981)).

The reasonable expectations doctrine is not without limit. Coverage cannot be expanded on a general equitable basis, nor can policy holders simply allege that certain coverage did not meet their expectations. *Bailey*, 255 P.3d at 1054. For example, in *Tynan's Nissan, Inc. v. American Hardware Mutual Insurance Co.*, 917 P.2d 321, 324 (Colo. App. 1995), the insured argued that, because it purchased what it believed to be a comprehensive insurance policy, it had a reasonable expectation that the policy would cover actions brought under the Colorado Uniform Consumer Credit Code. The court refused to reform the policy on that basis because the insured's expectation was contrary to the ordinary meaning of the policy and therefore unreasonable. *Id.*; *see also Bailey*, 255 P.3d at 1056 (holding that no reasonable person would expect rental car insurance to cover felonious acts).

Insurers, for their part, must draft exclusions "in clear and unequivocal language and must call such limiting conditions to the attention of the insured." *Tynan's Nissan,* 917 P.2d at 324 ("[a]bsent such disclosure, coverage will be deemed to be that which could be expected by the ordinary lay person"). For example, in a case where the exclusionary language was printed in small, grey type on the back side of the agreement, the trial court found the insurer had made a "concerted effort" to deceive

which the Colorado Supreme Court noted, among other thing, in finding the policy

unconscionable.  *Davis*, 712 P.2d at 992.[5]

Here, a reasonable juror could not find the PCIC application and policy

deceptive.  The paragraph detailing the exclusions in the application is clearly labeled

"Policy Exclusions" and the terms "open flame" and "heating devices" are listed in print

that is not so fine as to be "impossible to read."  Docket No. 32-12 at 5; *see Davis*, 712

P.2d at 991.  Further, the paragraph is unlikely to escape the insured's notice because

it requires the applicant to initial it.  Docket No. 32-12 at 5.

The insurance policy's first page calls the reader's attention to the exclusions

with the following notice: "**PLEASE READ ALL PORTIONS OF THIS POLICY**

**CAREFULLY.  THERE ARE A NUMBER OF ENDORSEMENTS, EXCLUSIONS,**

**CONDITIONS AND TERMS THAT MAY DELETE, MODIFY OR EXPAND THE**

**COVERAGE PROVISIONS STATED ELSEWHERE IN THE POLICY.  ALL PORTIONS**

**OF THIS POLICY ARE TO BE READ TOGETHER.**"  Docket. No. 32-3 at 3.  Similarly,

the second page states: "**NOTE THE FOREGOING POLICY FORMS ARE SUBJECT**

**TO ENDORSEMENTS, EXCLUSIONS, CONDITIONS AND TERMS THAT MAY**

**DELETE, MODIFY OR EXPAND THE COVERAGE PROVISIONS STATED**

**ELSEWHERE IN THE POLICY.**"  *Id.* at 4.[6]  The exclusions themselves begin on page

---

[5]Courts will often look to a traditional unconscionability analysis when considering deception under the reasonable expectations doctrine.  *Bailey*, 255 P.3d at 1055.

[6]The table of contents incorrectly labels "Additional Exclusions" as contained in part VI instead of part VIII, however, the correct page number is listed.  *Id.* at 5.

44 and the section is clearly labeled as such.  *Id.* at 46.  There are 27 paragraphs of exclusions, with the mold and heating element exclusions being stated in paragraphs (G) and (K) respectively.  *Id.* at 46-53.

The Court finds, as a matter of law, that the exclusionary language in the application and policy was clear and unequivocal and, furthermore, the application's requirement of initials and the insurance policy's opening notices were sufficient to call the exclusions to the attention of the insured.

The last issue to consider is the "marketing materials" that included the statement "PCIC's personalized underwriting process allows us to tailor coverage to properly outfit the contractor with excellent coverage and rates."  Docket No. 32-11 at 7.  For the same reasons the statement is not actionable fraud or a deceptive trade practice under the CCPA, no reasonable insured could view the above-mentioned phrase as deceptive to the point of creating a reasonable expectation of coverage.  It is a single statement, made online, and is alone insufficient to suggest a "concerted effort" to deceive.  *See Davis*, 712 P.2d at 992.[7]

No reasonable juror could find deception in the application, policy, or the online statement sufficient to create a reasonable expectation of coverage for liability resulting from use of a heating element.  Therefore, PCIC's Motion for Summary Judgment will be granted with respect to this issue.

---

[7]Because 2-BT has failed to show deceptive circumstances, the Court has no need to consider the affidavits filed with PCIC's reply brief.  *See* Docket No. 42-1; Docket No. 42-2.

### 2.  Illusory Contracts

2-BT claims that the exclusions in the PCIC policy are contrary to public policy and therefore render the contract illusory.[8]  Docket No. 54 at 2.

"Exclusions impermissibly render coverage illusory when they in effect allow the insurer to receive premiums when realistically it is not incurring any risk of liability.'" *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 843 (Colo. App. 2008) (quoting *O'Connor v. Proprietors Ins. Co.*, 696 P.2d 282, 285 (Colo. 1985)); *see also Horace Mann Ins. Co. v. Peters*, 948 P.2d 80, 86 (Colo. App. 1997) (holding that intentional act exclusion did not render policy illusory where the policy provided coverage for acts arising out of disciplinary actions).  However, insurance contracts that cover "some risk that the parties can reasonably anticipate" are not rendered illusory by exclusions.  *Northfield Ins.*, 207 P.3d at 844.

The Court finds that the PCIC policy is not illusory.  It is undisputed that the policy covers liability for personal injury, advertising injury, and any property damage not otherwise subject to the exclusions.  Docket No. 32 at 11, ¶ 61; Docket No. 35 at 8. While 2-BT claims that the use of heat creates the greatest risk of injury and damage [Docket No. 54 at 2] and is present in 75% of its work, the remaining 25% does not involve the use of a heat source and covers other risks including improper installation, improper ventilation, flood damage from leaks in the system, damage from condensation, and other negligent acts.  Docket No. 32 at 5, ¶ 23; Docket No. 35 at 8,

---

[8]2-BT raises this argument in the Complaint [Docket No. 4 at 2] and Final Pretrial Order [Docket No. 54 at 2], but does not clearly mention this argument or respond to PCIC's counter-arguments in its response brief.  *See* Docket No. 35.  Nevertheless, the Court will consider the argument on the merits.

¶ 19; Docket No. 42 at 2, ¶ 19.  Therefore, because PCIC retains liability for some of the risks reasonably anticipated and undisputed by the parties, the policy is not illusory as a matter of law.  Accordingly, there is no genuine issue of material fact and the Court will grant summary judgment for PCIC with respect to 2-BT's claim that the insurance policy is illusory.

### D. Motion to Strike

2-BT's Motion to Strike Defendant's Summary Judgment Reply Evidence [Docket No. 43] asks the Court to strike two affidavits PCIC attached to its reply brief.  Docket No. 42-1, Docket No. 42-2.  As noted above, the Court did not find it necessary to consider the affidavits in resolving PCIC's Motion for Summary Judgment.  Therefore, 2-BT's Motion to Strike will be denied as moot.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Strike [Docket No. 43] is denied as moot.  It is further

**ORDERED** that PCIC's Motion for Summary Judgment [Docket No. 32] is **GRANTED**.  It is further

**ORDERED** that the trial preparation conference scheduled for Monday, October 21, 2013 and trial scheduled for Tuesday, November 5, 2013 are vacated.  It is further

**ORDERED** that this case is dismissed and defendant may have its costs.

DATED October 18, 2013.

BY THE COURT:

s/Philip A. Brimmer
_____
PHILIP A. BRIMMER
United States District Judge